## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMES MADISON PROJECT           * <br> 1250 Connecticut Avenue, N.W.   * <br> Suite 200                      * <br> Washington, D.C. 20036          * <br>                                 * <br>    and                     * <br>                                 * <br> MATTHEW COLE                    * <br> 200 Hicks Street                * <br> Brooklyn, New York 11201        * <br>                                 * <br>    Plaintiffs              * <br>                                 * <br>    v.                      * <br>                                 * <br> CENTRAL INTELLIGENCE AGENCY     * <br> Washington, D.C. 20505          * <br>                                 * <br>    Defendant               * <br> * * * * * * * * * * * * | Civil Action No. 07-2306 (RBW) |

## **FIRST AMENDED COMPLAINT**

This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, as amended, and the Administrative Procedure Act, 5 U.S.C. § 702 et seq., for the expedited processing and release of records in the possession or control of the Central Intelligence Agency ("CIA") pertaining to the 2005 destruction of videotapes of the interrogations of Zayn Abidin Muhammed Hussein Abu Zubaida (a/k/a Abu Zubaydah) and Abd al-Rahim al-Nashiri and other suspected terrorists.

## **JURISDICTION**

1. This Court has both subject matter jurisdiction over this action and personal jurisdiction over the defendants pursuant to 5 U.S.C. §§ 552(a)(4)(B), 702 and 28 U.S.C. § 1331.

## **VENUE**

2. Venue is appropriate under 5 U.S.C. §§ 552(a)(4)(B), 703 and 28 U.S.C. § 1391.

## PARTIES

3. Plaintiff The James Madison Project ("JMP") is a non-profit corporation organized under the laws of the District of Columbia with the primary purpose of educating the public on issues relating to intelligence gathering and operations, secrecy policies, national security and government wrongdoing. It maintains its principal place of business in the District of Columbia.

4. Plaintiff Matthew Cole ("Cole") is an investigative journalist who has written for *GQ*, *Wired*, *Salon* and *ESPN The Magazine* among others. Copies of some of his published work can be found at *http://www.matthewacole.com*. He is currently writing a book about the CIA for Simon & Schuster. He is a graduate of Columbia University's Graduate School of Journalism.

5. Defendant CIA is an agency within the meaning of 5 U.S.C. § 552 (e) and is in possession and/or control of the records requested by JMP and Cole which are the subject of this action.

## BACKGROUND

6. In or around 2002, the CIA videotaped the interrogation of Al Qaeda operatives to include Zayn Abidin Muhammed Hussein Abu Zubaida (a/k/a Abu Zubaydah) and Abd al-Rahim al-Nashiri, both of whom were in the CIA's custody.

7. At least two videotapes pertaining to these interrogations were willfully destroyed by the CIA in or around November 2005.

8. On December 6, 2007, CIA Director General Michael V. Hayden issued a statement to CIA employees on the "Taping of Early Detainee Interrogations." The statement read in full:

> The press has learned that back in 2002, during the initial stage of our terrorist detention program, CIA videotaped interrogations, and destroyed the tapes in 2005. I understand that the Agency did so only after it was determined they were no longer of intelligence value and not relevant to

2

any internal, legislative, or judicial inquiries—including the trial of Zacarias Moussaoui. The decision to destroy the tapes was made within CIA itself. The leaders of our oversight committees in Congress were informed of the videos years ago and of the Agency's intention to dispose of the material. Our oversight committees also have been told that the videos were, in fact, destroyed.

If past public commentary on the Agency's detention program is any guide, we may see misinterpretations of the facts in the days ahead. With that in mind, I want you to have some background now.

CIA's terrorist detention and interrogation program began after the capture of Abu Zubaydah in March 2002. Zubaydah, who had extensive knowledge of al-Qa'ida personnel and operations, had been seriously wounded in a firefight. When President Bush officially acknowledged in September 2006 the existence of CIA's counter-terror initiative, he talked about Zubaydah, noting that this terrorist survived solely because of medical treatment arranged by CIA. Under normal questioning, Zubaydah became defiant and evasive. It was clear, in the President's words, that "Zubaydah had more information that could save innocent lives, but he stopped talking."

That made imperative the use of other means to obtain the information—means that were lawful, safe, and effective. To meet that need, CIA designed specific, appropriate interrogation procedures. Before they were used, they were reviewed and approved by the Department of Justice and by other elements of the Executive Branch. Even with the great care taken and detailed preparations made, the fact remains that this effort was new, and the Agency was determined that it proceed in accord with established legal and policy guidelines. So, on its own, CIA began to videotape interrogations.

The tapes were meant chiefly as an additional, internal check on the program in its early stages. At one point, it was thought the tapes could serve as a backstop to guarantee that other methods of documenting the interrogations—and the crucial information they produced—were accurate and complete. The Agency soon determined that its documentary reporting was full and exacting, removing any need for tapes. Indeed, videotaping stopped in 2002.

As part of the rigorous review that has defined the detention program, the Office of General Counsel examined the tapes and determined that they showed lawful methods of questioning. The Office of Inspector General also examined the tapes in 2003 as part of its look at the Agency's detention and interrogation practices. Beyond their lack of intelligence

>value—as the interrogation sessions had already been exhaustively detailed in written channels—and the absence of any legal or internal reason to keep them, the tapes posed a serious security risk. Were they ever to leak, they would permit identification of your CIA colleagues who had served in the program, exposing them and their families to retaliation from al-Qa'ida and its sympathizers.
>
>These decisions were made years ago. But it is my responsibility, as Director today, to explain to you what was done, and why. What matters here is that it was done in line with the law. Over the course of its life, the Agency's interrogation program has been of great value to our country. It has helped disrupt terrorist operations and save lives. It was built on a solid foundation of legal review. It has been conducted with careful supervision. If the story of these tapes is told fairly, it will underscore those facts.

9. Upon information and belief, numerous facts contained in General Hayden's statements are either inaccurate or intentionally misleading.

10. Upon information and belief, the videotapes were neither turned over nor even the existence revealed in several federal court proceedings where production should have occurred. For example, in or around 2003 and 2005 CIA lawyers told prosecutors handling the Zacharias Moussaoui case that the CIA did not possess recordings of interrogations sought by the judge even though, arguably, these destroyed tapes were potentially subject to disclosure to the defense.

11. Nor did the CIA disclose the existence of the videotapes to the September 11th Commission. According to Philip D. Zelikow, who served as the Commission's Executive Director, "The commission did formally request material of this kind from all relevant agencies, and the commission was assured that we had received all the material responsive to our request." He reportedly stated that "'No tapes were acknowledged or turned over, nor was the commission provided with any transcript prepared from recordings." Daniel Marcus, who served as the Commission's General Counsel, was also

4

involved in the discussions about the existence of any interviews with Al Qaeda leaders and has stated he was told nothing about any tapes being destroyed. He publicly commented that if tapes were destroyed, "it's a big deal, it's a very big deal," particularly because it could amount to obstruction of justice to withhold evidence being sought in criminal or fact-finding investigations.

    12. Although the CIA claims the September 11th Commission never specifically asked for any tape recordings of prisoner interrogations, both co-chairmen, Thomas H. Kean and Lee H. Hamilton, have publicly stated they informed the CIA, verbally and in writing, that they wanted all material connected to the interrogations of Al Qaeda operatives in the agency's custody. Former Congressman Hamilton was quoted as saying "The CIA certainly knew of our interest in getting all the information we could on the detainees, and they never indicated to us there were any videotapes…Did they obstruct our inquiry? The answer is clearly yes. Whether that amounts to a crime, others will have to judge."

    13. On December 8, 2007, the Justice Department's National Security Division and the CIA's Office of Inspector General initiated a joint preliminary inquiry into the destruction of any videotapes depicting interrogations of top operatives of Al Qaeda. Additionally, it was announced that investigations would be commenced by both the Senate and House intelligence committees. The Department of Justice and CIA initially refused to cooperate with the Congressional oversight committees but that position was reversed particularly after it became public that several White House attorneys - Alberto R. Gonzales, who served as White House counsel until early 2005; David S. Addington, who was the counsel to Vice President Dick Cheney and is now his chief of staff; John B.

Bellinger III, who until January 2005 was the senior lawyer at the National Security Council; and Harriet E. Miers, who succeeded Mr. Gonzales as White House counsel – participated in discussions surrounding the destruction of the tapes.

14. When the Justice Department urged the House panel to postpone any inquiry on the grounds it might hinder the ongoing internal review, the House committee's Democratic chairman, Representative Silvestre Reyes of Texas, and the ranking Republican member, Representative Peter Hoekstra of Michigan, refused noting that there were numerous precedents for Congressional inquiries to proceed in parallel with criminal investigations. On December 19, 2007, the CIA reversed its earlier position and agreed to make documents related to the destruction of the videotapes available to the House Intelligence Committee and to allow the CIA's acting General Counsel, John A. Rizzo, to testify about the matter. Mr. Rizzo testified before the House Intelligence Committee in a closed hearing on January 16, 2008.

15. On January 2, 2008, Attorney General Michael B. Mukasey announced that the Justice Department had elevated its inquiry into a formal criminal investigation to be headed by John H. Durham, the First Assistant United States Attorney in the United States Attorney's Office for the District of Connecticut. This decision was based upon the joint inquiry by the Justice Department and the CIA, which concluded that the destruction of the tapes warranted a full criminal investigation.

16. On January 3, 2008, the former ranking Democratic member of the House intelligence committee, Congresswoman Jane Harman of California, publicly released a letter dated February 10, 2003, in which she urged the CIA not to destroy the tapes, as it would "reflect badly on the agency." Harman wrote the letter after becoming the ranking

Democratic member on the committee and upon being informed by the CIA of its intention to destroy the tapes once an internal inquiry into the CIA's interrogation and detention program had been completed.

17. Upon information and belief, John D. Negroponte, who was Director of National Intelligence at the time the tapes were destroyed, sent a memorandum in Summer 2005 to Hon. Porter Goss, then CIA director, advising against destroying the tapes. Allegedly, then White House counsel Harriet Miers also provided similar advice.

18. Upon information and belief, the actual decision to destroy the tapes was made by Jose A. Rodriguez Jr., who was then head of the Directorate of Operations (now the National Clandestine Service). It has been reported that Mr. Rodriguez received legal guidance from two CIA lawyers, Steven Hermes and Robert Eatinger, and that written guidance was created concluding Mr. Rodriguez had the authority to destroy the tapes and that the destruction would violate no laws. Although Mr. Rodriguez was subpoenaed by the House Intelligence Committee to testify at the closed hearing on January 16, 2008, he refused to testify absent a grant of immunity.

19. Upon information and belief, the destruction of the tapes and/or their withholding from relevant court proceedings or investigations constituted a violation of law.

20. Upon information and belief, in the more than ten (10) year period since expedited processing became mandated by law, the CIA has granted and processed the fewest number of expedited FOIA requests than any other federal agency. According to the CIA's Annual FOIA Report for Fiscal Year 2006, between 2004 and 2006, the CIA received a total of 111 requests for expedited processing but granted only one.

Notwithstanding the CIA's decision regarding the Cole FOIA request, it remains the agency with the most consistent pattern of denying requests for expedited processing.

## **COUNT ONE (JMP CIA FOIA REQUEST)**

21. JMP repeats and realleges the allegations contained in paragraphs 6 through 20 above, inclusive.

22. By letter dated December 9, 2007, JMP submitted a FOIA request for disclosure of all:

   (a) records pertaining to the 2005 destruction of videotapes of the interrogations of Zayn Abidin Muhammed Hussein Abu Zubaida (a/k/a Abu Zubaydah) and Abd al-Rahim al-Nashiri – please refer to the enclosed newspaper articles for spelling variations;

   (b) records, including correspondence, created after September 11, 2001, with Members of Congress or its Committees, The 9/11 Commission ("National Commission on Terrorist Attacks Upon the United States") or the Department of Justice about (1) the existence of videotapes of interrogations of terrorist suspects; (2) requests for access to videotapes of interrogations of terrorist suspect; (3) warnings or instructions not to destroy any videotapes of interrogations of terrorist suspect; and/or (4) any investigation into your Agency's destruction of the tapes identified in (a);

   (c) records of interrogatory or document production requests, or any records discussing CIA responses thereto, received as part of any criminal prosecutions that sought acknowledgment of the existence and/or copies of videotape interrogations of terrorist suspects since September 11, 2001;

   (d) records of Freedom of Information Act requests received by your Agency after September 11, 2001, for copies of any records pertaining to videotape interrogations of terrorist suspects; and

   (e) records pertaining to (a) that specifically reflect the identity of the attorney within your Agency's Office of General Counsel who approved the destruction of the videotapes and any records setting forth the policy or legal analysis underlying that conclusion.

23. The request sought a waiver of all fees and expedited processing. Numerous copies of news articles and editorials from *The New York Times*, *The Washington Post*,

*Los Angeles Times* and other publications, as well as a list of selected newspaper articles – as just as an example – was submitted to the CIA to demonstrate the wide-spread world-wide interest in the topic.

24. The CIA was required to issue a determination on the request for expedited processing "within 10 days after the date of the request." 5 U.S.C. § 552 (a)(6)(E)(ii)(I). Thus, a response was due by on or before December 20, 2007.

25. By letter dated December 19, 2007, the CIA denied JMP's request for expedited processing. This letter was not received by JMP prior to the filing of the Original Complaint on December 21, 2007. No further correspondence has been received from the CIA by JMP.

26. JMP has met the requisite requirements pursuant to the FOIA and is entitled to expedited processing of its request.

27. JMP has a legal right under FOIA to be granted expedited processing, and there is no legal basis for the denial by the CIA of said right.

28. As twenty working days have elapsed without a substantive determination by the CIA, JMP has constructively exhausted all required administrative remedies.

29. JMP has a legal right under the FOIA to obtain the information it seeks, and there is no legal basis for the denial by the CIA of said right.

### COUNT TWO (APA - EXPEDITED PROCESSING)

30. JMP repeats and realleges the allegations contained in paragraphs 6 through 20 above, inclusive.

31. JMP submitted a request to the CIA dated December 9, 2007, for expedited processing of all responsive records.

32. By letter dated December 19, 2007, the CIA denied JMP's request for expedited processing. This letter was not received by JMP prior to the filing of the Original Complaint on December 21, 2007.

33. JMP has met the requisite requirements as set forth in the CIA's internal regulations and JMP is entitled to expedited processing of its FOIA request.

34. JMP is not required to exhaust administrative remedies with respect to a denial of a request for expedited processing.

35. JMP has a legal right under the CIA's regulations to be granted expedited processing, and there is no legal basis for the denial by the CIA of said right.

## COUNT THREE (CIA FOIA REQUEST)

36. Cole repeats and realleges the allegations contained in paragraphs 6 through 20 above, inclusive.

37. By letter dated December 27, 2007, Cole submitted a FOIA request for disclosure of all:

> (a) records pertaining to the 2005 destruction of videotapes of the interrogations of Zayn Abidin Muhammed Hussein Abu Zubaida (a/k/a Abu Zubaydah) and Abd al-Rahim al-Nashiri – please refer to the enclosed newspaper articles for spelling variations;
>
> (b) records, including correspondence, created after September 11, 2001, with Members of Congress or its Committees, The 9/11 Commission ("National Commission on Terrorist Attacks Upon the United States") or the Department of Justice about (1) the existence of videotapes of interrogations of terrorist suspects; (2) requests for access to videotapes of interrogations of terrorist suspect; (3) warnings or instructions not to destroy any videotapes of interrogations of terrorist suspect; and/or (4) any investigation into your Agency's destruction of the tapes identified in (a);
>
> (c) records of interrogatory or document production requests, or any records discussing CIA responses thereto, received as part of any criminal prosecutions that sought acknowledgment of the existence and/or copies of videotape interrogations of terrorist suspects since September 11, 2001;
>
> (d) records of Freedom of Information Act requests received by your Agency after September 11, 2001, for copies of any records pertaining to videotape interrogations of terrorist suspects; and
>
> (e) records pertaining to (a) that specifically reflect the identity of the attorney within your Agency's Office of General Counsel who approved the

>destruction of the videotapes and any records setting forth the policy or legal analysis underlying that conclusion.

38. The request sought a waiver of all fees and expedited processing. Numerous copies of news articles and editorials from *The New York Times*, *The Washington Post*, *Los Angeles Times* and other publications, as well as a list of selected newspaper articles – as just as an example – was submitted to the CIA to demonstrate the wide-spread world-wide interest in the topic.

39. The CIA was required to issue a determination on the request for expedited processing "within 10 days after the date of the request." 5 U.S.C. § 552 (a)(6)(E)(ii)(I). Thus, a response was due by on or before January 7, 2008.

40. By letter dated January 11, 2008 and postmarked January 14, 2008, the CIA granted Cole's request for expedited processing. Notwithstanding being granted expedited processing, the letter stated that, due to a backlog of requests, the CIA would not likely be able to provide a substantive determination within twenty working days.

41. As twenty working days have elapsed without a substantive determination by the CIA, Cole has constructively exhausted all required administrative remedies.

42. Cole has a legal right under the FOIA to obtain the information it seeks, and there is no legal basis for the denial by the CIA of said right.

WHEREFORE, plaintiffs James Madison Project and Matthew Cole pray that this Court:

(1) orders the CIA to grant expedited processing to JMP, or otherwise expedite this action in every way pursuant to 28 U.S.C. § 1657 (a);

(2) enforces the CIA's decision to grant expedited processing to Cole and set a schedule for the release of responsive records;

(3) awards JMP and Cole reasonable costs and attorney's fees as provided in 5 U.S.C. § 552 (a)(4)(E) and/or 28 U.S.C. § 2412 (d); and

(4) grants such other relief as the Court may deem just and proper.

Date:   February 1, 2008

                                              Respectfully submitted,

                                              /s/
                                      _____
                                      Mark S. Zaid, Esq.
                                      DC Bar #440532
                                      Bradley P. Moss, Esq.
                                      D.C. Bar #975905
                                      Mark S. Zaid, P.C.
                                      1250 Connecticut Avenue, N.W.
                                      Suite 200
                                      Washington, D.C. 20036